OPINION
{¶ 1} Defendant-appellant, Gerardo Villa-Garcia ("appellant"), appeals from a judgment of the Franklin County Court of Common Pleas sentencing him to prison after a jury convicted him of two counts of child endangering and one count of felonious assault. For the following reasons, we affirm that judgment in part and reverse in part, and remand the matter for resentencing.
 {¶ 2} By indictment filed November 8, 2002, appellant was charged with one count of child endangering in violation of R.C.2919.22(B)(1), one count of child endangering in violation of R.C. 2919.22(A), and one count of felonious assault in violation of R.C. 2903.11(A)(1). These charges stemmed from injuries Madison Freditz ("Madison"), a five-month old baby, sustained in September 2002. At that time, Madison and her mother, Trish Fredritz-Nonato ("Trish"), were living with appellant. After appellant pled not guilty to all of the charges, the case proceeded to a jury trial. The testimony presented at trial revealed the following facts.
 {¶ 3} On September 19, 2002, Trish and her mother, Patricia Fredritz ("Mrs. Freditz"), took Madison to a doctor's appointment to get her immunization shots. The doctor noticed a bruise on Madison's back, but blood tests and X-rays revealed nothing unusual. Trish testified that the bruise could have occurred earlier in the week when Madison slipped while Trish washed her in the bathroom sink. Trish had to work after the doctor's appointment, so Mrs. Fredritz kept Madison for the night. Mrs. Fredritz testified that although Madison was a little feverish, nothing occurred that night to cause her any concern.
 {¶ 4} The next morning, Mrs. Fredritz fed and bathed Madison. Nothing occurred that morning to cause her any concern for Madison. Ms. Fredritz returned Madison to Trish later that afternoon. Trish then dropped Madison off with Jocelyn Garcia ("Ms. Garcia"), appellant's relative. Ms. Garcia testified that Madison was acting normally when Trish dropped her off at her house. Ms. Garcia gave Madison a bottle around 5 p.m. that night. Although Madison spit up a bit of the formula, Ms. Garcia was not concerned. After Madison had a nap, Ms. Garcia fed her another bottle, which she took without a problem. Ms. Garcia then put Madison to bed. While Madison slept, Ms. Garcia noticed that Madison's head was moving from side to side. Ms. Garcia was a bit worried and called Trish. Trish told Ms. Garcia that Madison was probably just reacting to her shots. Appellant came to Ms. Garcia's house around 10 p.m. and took Madison back to his house. Ms. Garcia testified that Madison seemed normal when appellant picked her up.
 {¶ 5} Trish testified that she spent the next day, September 21, 2002, with Madison. After Madison woke up at 7:30 a.m., Trish bathed and fed her a bottle. Trish gave Madison another bottle at about 1 p.m. Trish gave Madison a third bottle around 4 p.m., which Madison did not finish. After that feeding, Trish and appellant laid Madison on the floor. Madison was restless and crying. Around 5 p.m., Trish went to work, leaving appellant and Madison alone in the apartment. When she left, Madison was sleeping on the floor.
 {¶ 6} Appellant testified that on September 21, 2002, he gave Madison a bottle around 4:30 p.m., and she took half of the bottle. He and Trish then laid a blanket down on the floor and put Madison to sleep. Madison had her normal color but was moving her head from side to side while she slept. After Trish left to go to work around 5 p.m., appellant took Madison off the floor and placed her into her cradle. She did not wake up or cry and he did not observe anything abnormal. Appellant went back to the living room and eventually fell asleep. He woke up around 8:35 p.m. and realized that he had not fed Madison. He went to the kitchen to prepare a bottle. He then woke Madison and she began to cry. Appellant realized that Madison's diaper was soiled. Appellant then changed her diaper. Madison continued to cry.
 {¶ 7} Appellant left Madison and went to the kitchen to turn the stove off. When he returned from the kitchen, he noticed that Madison was having a hard time breathing. He picked Madison up and began shaking her. He testified that he would grab her and shake her a little bit so that she would respond. Appellant testified that he shook Madison once and then shook her again, this time harder, when she did not respond. He denied hitting Madison, although he testified that her head was rattling when he shook her. Ten to 15 minutes later, appellant called Trish. Appellant did not call 911 because he does not speak English. After calling Trish, appellant held Madison in his arms. He testified that Madison was not crying or responding and was almost fainting. Appellant had no idea how Madison received the injuries she sustained.
 {¶ 8} Trish received appellant's phone call at work around 8:30 p.m. Appellant told her that something was wrong with Madison and that she should come home. Appellant sounded upset and panicked on the phone. When she returned home, Trish saw Madison in appellant's arms. Madison appeared pale and limp and Trish could not tell if she was breathing or not. Appellant was jiggling Madison to keep her alert. Trish then called 911.
 {¶ 9} When paramedics from the Columbus Fire Department arrived, Trish met them with Madison. Paramedic Henry Windle took Madison to his ambulance and assessed her condition. Madison was alert and conscious although a bit lethargic. Windle also felt that Madison was somewhat pale and had a slightly abnormal heartbeat. The paramedics transported Madison to Children's Hospital where she was treated.
 {¶ 10} Dr. Mary Ranee Leder is a pediatrician and member of the Child Abuse Team at Children's Hospital. Dr. Leder examined Madison and reviewed her medical records, blood tests and X-rays. Dr. Leder testified that the emergency department records indicated that Madison had several bruises on her body on admission, but that they had all healed by the time she examined Madison a few days later. After reviewing Madison's head scans and X-rays, Dr. Leder determined that Madison's skull was fractured and that she had a subdural hematoma, or bleeding in two areas on the surface of her brain between the brain and the skull. Dr. Leder described Madison's head injuries as severe. She testified that a subdural hematoma occurs as the result of a tearing of the blood vessels that run between the brain and the skull. These injuries are typically caused by an impact or by a severe acceleration force applied to the baby, such as may occur in severe motor vehicle accidents, where a baby falls from a substantial height, or where a baby is vigorously shaken.
 {¶ 11} Dr. Leder further testified that she asked Trish about Madison's condition the week before Madison was brought to the hospital. Trish stated that Madison was in her usual good state of health during that week. Trish told Dr. Leder that she bathed and fed Madison at 7:15 a.m. on September 21, 2002, and fed her later that day at 4:30 p.m. Trish told Dr. Leder that Madison seemed to be in good health that day and had no problems taking her 4:30 p.m. bottle. However, Trish indicated that she felt Madison was restless, meaning that Madison did not sleep as soundly as normal.
 {¶ 12} Dr. Leder further testified that absent evidence of an accidental cause, Madison's injuries were the result of shaken baby/impact syndrome. Dr. Leder explained that shaken baby syndrome is a set of medical findings that typically include some sort of head injury, which could include bleeding on the brain as well as injuries to the eye and other injuries such as fractures to different bones in the body. Shaken impact syndrome is a similar set of findings, with the addition of injuries such as a skull fracture or a bruise or swelling to the head that would suggest the baby's head was impacted against an object. She concluded that the only plausible explanation for Madison's injuries was vigorous shaking with impact, the type of shaking that a reasonable observer would realize is dangerous and could result in injury.
 {¶ 13} Dr. Leder also explained that these injuries would cause a baby to have problems breathing, to have problems eating, and to look limp or pale. Madison's symptoms would be more significant than just restlessness. Dr. Leder concluded that Madison's injuries most likely occurred sometime between the time she was last noted to appear normal, when Trish left her around 5 p.m., and later that night when appellant and Trish noticed that she was clearly abnormal, i.e., limp and pale. Madison's last feeding around 4:30 p.m. that day was also relevant to the timing of her injuries because Dr. Leder testified that it would be highly unlikely that a baby could eat normally after sustaining a head injury of this nature. Dr. Leder testified that Madison's skull fracture was of recent origin because Dr. Leder observed no healing of the fracture. She testified that the skull fracture could have occurred even a few hours before the X-ray was taken. Dr. Leder admitted that Trish told her Madison had bruised her forehead on the September 14, 2002, when she fell on a changing table and bumped her forehead. However, Dr. Leder opined that given the severity of Madison's injuries, the fall Trish described was insufficient to explain Madison's injuries.
 {¶ 14} On cross-examination, Dr. Leder testified that babies with less severe head injuries may act fussy or cry more. A head injury may also cause seizures in a baby, although she testified that the head movements described by Ms. Garcia would be an unusual manifestation of a seizure and would not raise her suspicions that Madison suffered a seizure. Dr. Leder explained that Madison did have a seizure while she was in the hospital, but that the seizure was caused by her injuries. Dr. Leder also testified that the vaccinations Madison received two days before she was admitted to the hospital would not have caused her severe head injuries. Dr. Leder indicated that the onset of symptoms after a head injury such as that sustained by Madison could be immediate or could take 12 to 24 hours. However, because Madison had to be placed on life support as a result of her injuries, it was likely that her symptoms appeared immediately.
 {¶ 15} On September 23, 2002, Detectives Anthony Monturo and Richard Moore of the Columbus Police Department's Juvenile Bureau interviewed appellant. Detective Moore testified that appellant did not indicate that Madison had any problems before September 21, 2002. Appellant told the detective that Madison was fed in the morning and then again around 4:30 p.m. Appellant told them that Trish left him alone with Madison around 5 p.m., and that Madison slept for a few hours. Appellant then woke her to feed her. He found that her diaper was soiled. Appellant told the detectives that he then went to prepare a bottle to feed her. When he came back from the kitchen, Madison was pale and not breathing, and he felt something was wrong. The detectives both testified that appellant stated that he then picked up Madison and shook her in an attempt to revive her. Appellant indicated that it was a light to medium shake. At that point, appellant told the detectives he called Trish to come home. Appellant also told the detectives that he shook Madison again after Trish came home. He described a light to medium back-and-forth motion.
 {¶ 16} The jury found appellant guilty of felonious assault and both child-endangering counts. The trial court sentenced appellant to a seven-year prison term for his felonious assault conviction and to seven-year and four-year prison terms for his two child-endangering convictions. The trial court ordered the prison sentences served concurrently.
 {¶ 17} Appellant appeals, assigning the following errors:
1. The trial court erred when it entered a judgment of conviction against the appellant when the evidence was insufficient to sustain the conviction and was not supported by the manifest weight of the evidence.
2. The trial court erred when it sentenced appellant to more than a minimum sentence without making the required statutory findings.
3. The trial court erred when it did not notify the defendant of his requirements under post-release control.
4. Imposition of multiple sentences for endangering children as separately charged in counts one and three of the indictment violates the double jeopardy clauses of the state and federal constitutions.
5. Endangering children as charged in counts one and three of the indictment are allied offenses of similar import. The trial court erred by imposing concurrent sentences for the two offenses when it should have directed the prosecutor to elect on which offense conviction would be entered and sentence pronounced.
6. Endangering children as charged in counts one and three of the indictment, and felonious assault as charged in count two, are allied offenses of similar import. the trial court erred by imposing concurrent sentences for the three offenses when it should have directed the prosecutor to elect on which offense conviction would by entered and sentence pronounced.
7. The court erroneously instructed the jury [sic] could be found guilty of felonious assault if it determined he knowingly caused physical harm to the victim.
 {¶ 18} Appellant contends in his first assignment of error that his convictions were not supported by sufficient evidence and were against the manifest weight of the evidence because the state failed to prove that appellant acted with the required culpable mental state for each offense. "The legal concepts of sufficiency of the evidence and weight of the evidence are both quantitatively and qualitatively different." State v. Thompkins
(1997), 78 Ohio St.3d 380, paragraph two of the syllabus. Therefore, each standard will be separately delineated.
 {¶ 19} The Ohio Supreme Court described the role of an appellate court presented with a sufficiency of the evidence argument in State v. Jenks (1991), 61 Ohio St.3d 259, paragraph two of the syllabus:
An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.
 {¶ 20} Whether the evidence is legally sufficient is a question of law, not fact. Thompkins, supra, at 386. Indeed, in determining the sufficiency of the evidence, an appellate court must give "full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." Jackson v. Virginia (1979), 443 U.S. 307, 319,99 S.Ct. 2781. Consequently, the weight of the evidence and the credibility of the witnesses are issues primarily determined by the trier of fact. State v. Yarbrough, 95 Ohio St.3d 227,2002-Ohio-2126, at ¶ 79; State v. Thomas (1982),70 Ohio St.2d 79, 80. A jury verdict will not be disturbed unless, after viewing the evidence in a light most favorable to the prosecution, it is apparent that reasonable minds could not reach the conclusion reached by the trier of fact. State v. Treesh
(2001), 90 Ohio St.3d 460, 484; Jenks, supra, at 273.
 {¶ 21} A manifest weight argument is evaluated under a different standard. "The weight of the evidence concerns the inclination of the greater amount of credible evidence offered in a trial to support one side of the issue rather than the other."State v. Brindley, Franklin App. No. 01AP-926, 2002-Ohio-2425, at ¶ 16. In order for a court of appeals to reverse the judgment of a trial court on the basis that the verdict is against the manifest weight of the evidence, the appellate court must disagree with the factfinder's resolution of the conflicting testimony. Thompkins, supra, at 387. The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses, and determines whether, in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction. Id. at 387, quoting State v. Martin
(1983), 20 Ohio App.3d 172, 175.
 {¶ 22} In order to convict appellant of felonious assault, the state must prove that appellant acted knowingly when he caused serious physical harm to Madison. R.C. 2903.11(A)(1). The definition of "knowingly" is found in R.C. 2901.22(B), which provides that "[a] person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist." A defendant acts knowingly, when, although not intending the result, he or she is nevertheless aware that the result will probably occur. State v. Edwards
(1992), 83 Ohio App.3d 357, 361. Therefore, felonious assault under R.C. 2903.11(A), combined with the definition of "knowingly" found in R.C. 2901.22(B), does not require that a defendant intend to cause "serious physical harm," but that the defendant acts with an awareness that the conduct probably will cause such harm. State v. Lee (Sept. 3, 1998), Franklin App. No. 97AP-1629.
 {¶ 23} Appellant contends the state, at most, proved that he acted negligently in caring for Madison. We disagree. Based upon a review of the testimony presented, we conclude that there was sufficient evidence to convict appellant of felonious assault.
 {¶ 24} The evidence presented indicated that Madison was normal and in a good state of health until the evening of September 21, 2002. Trish left Madison alone with appellant. When she returned home, she found Madison limp and pale and having difficulty breathing. Dr. Leder testified that Madison sustained severe head injuries: a skull fracture and bleeding on the surface of her brain. The doctor further testified that there was no evidence of an accidental cause for these injuries and that significant force was required to inflict these injuries. Dr. Leder opined that these injuries would typically be caused by an impact or by severe acceleration, such as can be seen in severe motor vehicle accidents where the child is not wearing a seat belt or is ejected from the car, where a baby falls from a substantial height, or is subjected to vigorous shaking. The injuries could not have been caused by an accidental fall in the bathtub. It was her opinion that Madison's injuries were caused by vigorous shaking with impact, the type of shaking that a reasonable observer would realize is dangerous and could result in injury.
 {¶ 25} Moreover, Dr. Leder testified that a baby with these injuries would develop symptoms almost immediately. These symptoms would include difficulty breathing and a limp and pale appearance. Dr. Leder testified that Madison likely sustained her injuries between the time she was last seen in a normal condition, around 4:30 p.m. when Trish left her with appellant, and when Trish saw Madison limp and pale after she arrived home around 9 p.m. Appellant was the only person with Madison during those hours.
 {¶ 26} We find that there was sufficient evidence for the jury to have concluded that appellant acted knowingly in causing serious physical harm to Madison given the testimony: (1) describing Madison as normal and healthy before she was alone with appellant; (2) describing Madison's significant injuries; (3) concluding that Madison's injuries were likely sustained during the time she was alone with appellant; and (4) that her injuries were likely caused by a very significant force that could not have been accidental and that a reasonable observer would realize is dangerous and could result in injury. Cf. Statev. Nasser, Franklin App. No. 02AP-1112, 2003-Ohio-5947, at ¶ 70-79 (noting it was not unusual that evidence of shaken baby syndrome was mainly circumstantial, especially where a child is in sole custody of one adult when injuries sustained). Therefore, appellant's conviction for felonious assault is supported by sufficient evidence.
 {¶ 27} Both counts of child endangering require the state to prove that appellant acted recklessly. State v. McGee (1997),79 Ohio St.3d 193; State v. Wasson, Franklin App. No. 02AP-211, 2002-Ohio-5963, at ¶ 36. R.C. 2901.22(C) defines the culpable mental state of "recklessness," as follows:
A person acts recklessly when, with heedless indifference to the consequences, he perversely disregards a known risk that his conduct is likely to cause a certain result or is likely to be of a certain nature. A person is reckless with respect to circumstances when, with heedless indifference to the consequences, he perversely disregards a known risk that such circumstances are likely to exist.
 {¶ 28} When recklessness is an element of an offense, knowledge or purpose is also sufficient culpability to establish this element. R.C. 2901.22(E). Therefore, the finding that there was sufficient evidence for a reasonable jury to conclude that appellant acted knowingly is also sufficient for a jury to determine that appellant acted recklessly to support his convictions for child endangering. R.C. 2901.22(E); cf. State v.Gulertekin (Dec. 3, 1998), Franklin App. No. 97AP12-1607 (affirming child endangering convictions where evidence indicated healthy baby, entrusted to defendant's care, suffered broken skull and subdural hemtoma consistent with shaken baby syndrome). Accordingly, appellant's convictions for child endangering are supported by sufficient evidence.
 {¶ 29} Similarly, we cannot say that the jury's verdicts are against the manifest weight of the evidence. Testimony indicated that Madison was acting normally and in good health before the evening of September 21, 2002. However, after she was left alone with appellant, she appeared limp and pale and had difficulty breathing. She was later diagnosed with a skull fracture and a subdural hematoma. According to Dr. Leder, given the severity of these injuries, these symptoms would likely appear immediately. The doctor also testified that in the absence of evidence indicating an accidental cause, these injuries were caused by severe shaking or impact, the type of shaking that a reasonable observer would realize is dangerous and could result in injury. Appellant was the only person with Madison after she last appeared well and before her symptoms appeared. Where medical testimony indicates that Madison would have been immediately symptomatic, and the first signs of any symptoms occurred while appellant was alone with the baby, the jury could properly find that Madison's injuries occurred while she was alone with appellant. See State v. Brooks (Sept. 25, 2001), Franklin App. No. 00AP-1440. Appellant did not offer evidence of any other alternative cause of Madison's injuries. Accordingly, the jury did not lose its way when it convicted appellant of all counts. The guilty verdicts are not against the manifest weight of the evidence. Appellant's first assignment of error is overruled.
 {¶ 30} For ease of analysis, we now address appellant's seventh assignment of error. In that assignment of error, appellant contends the trial court erred when it instructed the jury that it could find him guilty of felonious assault if he knowingly caused Madison physical harm, because the elements of felonious assault require the state to prove that appellant knowingly caused Madison serious physical harm. Appellant did not object to the instruction as given. Therefore, any error in the jury instructions merits reversal only if it rises to the level of plain error. State v. McKnight (Mar. 16, 1995), Franklin App. No. 94APA08-1242. A jury instruction does not amount to plain error "`unless, but for the error, the outcome of the trial would clearly have been different.'" Id., quotingState v. Long (1978), 53 Ohio St.2d 91, 97; State v.Underwood (1983), 3 Ohio St.3d 12, 14. We note that plain error is to be recognized "with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." State v. Noling, 98 Ohio St.3d 44, 2002-Ohio-7044, at ¶ 62; State v. Thompson (1987), 33 Ohio St.3d 1, 10; Crim.R. 52(B). Additionally, when reviewing the validity of a particular jury instruction, the challenged instruction may not be reviewed in isolation, but must be reviewed within the context of the entire charge. State v. Burchfield (1993), 66 Ohio St.3d 261.
 {¶ 31} The trial court's definition of felonious assault omitted the word serious from the instruction. However, we cannot say that the failure to include the word serious in the definition of felonious assault constituted plain error given the totality of the circumstances. First, the trial court later instructed the jury that felonious assault required serious physical harm. Second, one of appellant's child-endangering convictions required the jury to find that appellant caused serious physical harm to Madison. R.C. 2919.22(B)(1). The trial court properly defined that term in its instruction to the jury on that charge and the jury found appellant guilty of that charge, necessarily finding that appellant caused Madison serious physical harm. Finally, there is overwhelming evidence in the record that Madison sustained serious physical harm. She was hospitalized with bleeding on the surface of the brain and a skull fracture. Dr. Leder testified that Madison sustained severe head injuries which typically occur in severe motor vehicle accidents where the child is not wearing a seat belt or is ejected from the car, where a baby falls from a substantial height, or where a young child is vigorously shaken. For all of these reasons, we cannot say that but for the trial court's error, the outcome of the trial would clearly have been different. Accordingly, appellant's seventh assignment of error is overruled.
 {¶ 32} Appellant contends in his fourth assignment of error that the trial court erred when it imposed multiple sentences for his multiple child-endangering convictions. Appellant contends that he could not be subjected to multiple punishments for these offenses because child endangering pursuant to R.C. 2919.22(A) is a lesser-included offense of child endangering pursuant to R.C.2919.22(B)(1). We disagree.
 {¶ 33} The Double Jeopardy Clause of the Fifth Amendment to the Constitution of the United States provides that no person shall "be subject for the same offense to be twice put in jeopardy of life or limb." The right is likewise guaranteed by Section 10, Article I of the Ohio Constitution, which states: "No person shall be twice put in jeopardy for the same offense." This prohibition has three distinct aspects. "It protects against a second prosecution for the same offense after acquittal. It protects against a second prosecution for the same offense after conviction. And it protects against multiple punishments for the same offense." North Carolina v. Pearce (1969), 395 U.S. 711,717, 89 S.Ct. 2089, overruled on other grounds, Alabama v.Smith (1989), 490 U.S 794, 109 S.Ct. 2201.
 {¶ 34} Greater and lesser offenses are the same for purposes of the double jeopardy prohibition against multiple punishments when the lesser offense does not require proof of an element different from that required for proof of the greater offense.Brown v. Ohio (1977), 432 U.S. 161, 97 S.Ct. 2221. An offense may be a lesser-included offense of another if (1) the offense carries a lesser penalty than the other; (2) the greater offense cannot, as statutorily defined, ever be committed without the lesser offense, as statutorily defined, also being committed; and (3) some element of the greater offense is not required to prove the commission of the lesser offense. State v. Deem (1988),40 Ohio St.3d 205, paragraph three of the syllabus. When making the comparison Deem requires, the offenses must be compared "asstatutorily defined and not with respect to specific factual scenarios." State v. Barnes (2002), 94 Ohio St.3d 21, 26, (emphasis sic).
 {¶ 35} In order to convict a defendant of child endangering under R.C. 2919.22(A), the state must prove that: (1) an individual who is the parent, guardian, custodian, person having custody or control, or person in loco parentis of; (2) a child under 18 years of age; (3) recklessly created a substantial risk to the health or safety of the child; and (4) by violating a duty of care, protection, or support. To convict a defendant of child endangering under R.C. 2919.22(B)(1), the state must prove that: (1) the child is under 18 years of age; (2) an affirmative act of abuse occurred; and (3) the defendant recklessly committed the act of abuse.
 {¶ 36} These two offenses satisfy the first prong of theDeem test. R.C. 2919.22(A), as enhanced, is a third degree felony while R.C. 2919.22(B)(1), as enhanced, is a second degree felony. However, the two offenses, as statutorily defined, do not satisfy the second prong of the Deem test. As statutorily defined, an individual can commit the greater offense in R.C.2919.22(B)(1) without committing the lesser offense in R.C.2919.22(A). State v. Minor (Mar. 21, 1991), Cuyahoga App. No. 58289; State v. Smathers (Dec. 20, 2000), Summit App. No. 19945; State v. Jones (Dec. 7, 1989), Licking App. No. CA-3457. Any individual who recklessly abuses a child may violate R.C.2919.22(B)(1). However, only a certain, defined group of people who violate a duty of care, protection or support can violate R.C. 2919.22(A). Therefore, a person not in that class of people can violate R.C. 2919.22(B)(1) without violating R.C. 2919.22(A). Additionally, one can recklessly abuse a child in violation of R.C. 2919.22(B)(1) without violating a duty of care as required by R.C. 2919.22(A). Smathers, supra; State v. Cherry, Summit App. No. 20771, 2002-Ohio-3738, at ¶ 80. Because the greater offense can be committed without committing the lesser offense, R.C. 2919.22(A) is not a lesser-included offense of R.C.2919.22(B)(1). Appellant's fourth assignment of error is overruled.
 {¶ 37} Appellant contends in his fifth assignment of error that his two child endangering convictions were allied offenses of similar import and should have been merged for sentencing in accordance with R.C. 2941.25(A). Likewise, appellant's sixth assignment of error contends that his child endangering convictions and felonious assault conviction were also allied offenses of similar import and should have been merged for sentencing. We disagree.
 {¶ 38} R.C. 2941.25(A) provides that:
Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.
 {¶ 39} In determining whether crimes are allied offenses of similar import, the Supreme Court of Ohio explained that under R.C. 2941.25(A), "[c]ourts should assess, by aligning the elements of each crime in the abstract, whether the statutory elements of the crimes `correspond to such a degree that the commission of one crime will result in the commission of the other.'" State v. Rance (1999), 85 Ohio St.3d 632, 638, quoting State v. Jones (1997), 78 Ohio St.3d 12, 14. The court explained that if the elements do correspond, the defendant may not be convicted of both "unless the court finds that the defendant committed the crimes separately or with separate animus." Id. at 638-639; R.C. 2941.25(B).
 {¶ 40} In concluding that appellant's child-endangering convictions were not lesser included offenses, we have already determined that a violation of R.C. 2919.22(B)(1), as statutorily defined, does not automatically result in a violation of R.C.2919.22(A). Accordingly, under the Rance analysis, the two child-endangering offenses do not correspond to such a degree that the commission of one crime will result in the commission of the other. Therefore, the two offenses are not allied offenses of similar import and appellant could properly be convicted of both offenses. See Jones and Smathers, supra. Appellant's fifth assignment of error is overruled.
 {¶ 41} Felonious assault and child endangering as proscribed under R.C. 2919.22(A) are not allied offenses of similar import.State v. Cudgel (Mar. 9, 2000), Franklin App. No. 99AP-532;State v. Barton (1991), 71 Ohio App.3d 455, 464-465. Although the two offenses both have causation and the resultant serious physical harm in common, a conviction of felonious assault requires proof that appellant acted knowingly while the child-endangering conviction only requires proof that appellant acted recklessly. "Although proof of knowledge may suffice to prove recklessness, proof of recklessness is not sufficient to prove knowledge." Cudgel, supra. Given these different culpable mental states, it cannot be said that an act of child endangering in violation of R.C. 2919.22(B)(1) results in the commission of a felonious assault. In addition, one can commit an act of felonious assault on someone over the age of 18 and not be guilty of child endangering. State v. Anderson (1984),16 Ohio App.3d 251, 254; State v. Potter, Cuyahoga App. No. 81037, 2003-Ohio-1338, fn. 4, overruled on other grounds, State v.Campbell (1991), 74 Ohio App.3d 352. Accordingly, because the statutory elements of the crimes do not correspond to such a degree that the commission of one crime will result in the commission of the other, the offenses are not allied offenses of similar import. Therefore, appellant's sixth assignment of error is overruled.
 {¶ 42} Finally, the state concedes that the trial court erred when it sentenced appellant by failing to make required statutory findings and by failing to notify appellant of post-release control. Therefore, appellant's second and third assignments of error are sustained, and the matter must be remanded to the trial court for resentencing to comply with these statutory guidelines.
 {¶ 43} In conclusion, appellant's first, fourth, fifth, sixth and seventh assignments of error are overruled, and appellant's second and third assignments of error are sustained. The judgment of the Franklin County Court of Common Pleas is affirmed in part and reversed in part, and the matter is remanded for resentencing in accordance with the appropriate statutory guidelines.
Judgment affirmed in part,
reversed in part
and cause remanded for resentencing.
Bryant and Brown, JJ., concur.