OPINION
{¶ 1} Defendant-appellant, Robert Smith ("defendant"), appeals from a judgment of the Franklin County Court of Common Pleas convicting him of one count of felonious assault. For the following reasons, we affirm that judgment.
 {¶ 2} By indictment filed December 2, 2003, defendant was charged with one count of attempted murder in violation of R.C. 2923.02, and one count of felonious assault in violation of R.C. 2903.11. These charges stem from an altercation ("the incident") between defendant and Rahim Wilson ("Rahim") on November 23, 2003, in which Rahim sustained serious injuries. After defendant pled not guilty to all of the charges, the case proceeded to a jury trial. The testimony presented at trial revealed the following facts.
 {¶ 3} Tolisca White ("Tolisca") met Rahim in a chatroom on the internet. Rahim was born a woman but led her life as a man, and had been doing so at the time she met Tolisca.[1] Rahim and Tolisca's romantic relationship was short lived, but the two remained friends. Subsequently, Rahim became romantically involved with Ebony Milton ("Ebony"), and at the time of the incident, Rahim and Ebony held themselves out as being husband and wife. Through Rahim, Ebony and Tolisca also became friends, and the three of them would socialize together. Their socializing continued even after defendant moved in with Tolisca, with whom he fathered a child.
 {¶ 4} On November 23, 2003, Tolisca, Rahim, and Ebony ("the group") made plans to go to Wal-Mart and then see a movie. Rahim and Ebony picked up Tolisca, who also brought her son. During the movie, Rahim's cell phone rang two or three times, with Tolisca's home phone number being displayed on the cellular phone's caller ID feature. Rahim answered the phone one time, but the caller did not say anything.
 {¶ 5} After the movie, the group went back to Tolisca's apartment. When they arrived, defendant was sitting at the kitchen table. Having noticed that Tolisca's skirt was missing a button, defendant asked Tolisca if she had had sex with Rahim. Tolisca denied having sex with Rahim, at which point defendant responded, "girl, don't you know that I will kill all of you in this house." (Trial Tr. Vol. I. at 131, 158.)
 {¶ 6} Defendant then called his mother. He told his mother that he was sick of living with Tolisca and paying all of her bills. After the call ended, defendant asked Rahim and Ebony to step outside because he wanted to talk to Tolisca alone. Rahim and Ebony complied with his request, went outside, and sat on the hood of Rahim's car, which was parked right behind the apartment. A few minutes later, Tolisca came to the back door and invited Rahim and Ebony back inside. When they went inside, defendant had left the apartment through the front door.
 {¶ 7} Approximately two or three minutes later, defendant came and stood at the back door and told Rahim something along the lines of "didn't I tell you to get the `F' out of my house." (Id. at 103, 104, 160, 183.) Rahim and Ebony got up to leave, and as Rahim was exiting through the back door, defendant pushed her up against the wall. Words were exchanged, prompting Tolisca to interpose herself between Rahim and defendant to prevent a physical altercation. A moment or so later, defendant swung around Tolisca at Rahim, striking Rahim's neck.
 {¶ 8} Rahim thought defendant had punched her, but in actuality, he had slashed her throat with a box cutter. Not yet knowing she had been cut, Rahim chased defendant, and Ebony followed. When Ebony got close to Rahim, she saw that Rahim's neck was bleeding and screamed "you are cut, you are bleeding." (Id. at 105.) Rahim put her hands to her neck and noticed that they were covered with blood.
 {¶ 9} Ebony testified that she then grabbed Rahim by the arm, and assisted her back to Tolisca's apartment. Ebony found a towel near the back door of Tolisca's apartment and gave it to Rahim to put around her neck. They then told Tolisca, who was in the apartment, to call the police, but the phone cord would not stay in the wall, making it impossible to complete a call. Ebony screamed for someone to call 9-1-1. Marie Ford ("Marie"), who was next door to Tolisca's apartment, came outside and called 9-1-1. Defendant, who was standing behind Rahim's car, approached the apartment, saying something to the effect of "I will kill you boy. Didn't I tell you I would kill you?" (Id. at 106.) When Rahim and Ebony stepped outside to go to the next door neighbor's to call 9-1-1 again, defendant threw something at them. Defendant next kicked in the windows of Rahim's car, and while he was doing so, he kept saying that he was going to kill Rahim. An unidentified man, who appeared at the scene, accompanied Rahim and Ebony outside, and told Rahim to apply pressure to her neck. At that point, defendant left the immediate area of the scene. The police arrived soon thereafter and apprehended defendant, who was approximately 200 yards from the scene.
 {¶ 10} Marie testified that she was in her grandmother's apartment, which was located next to Tolisca's, with a group of her friends when one of them alerted her to an argument outside. When Marie looked outside, she saw and heard defendant "stomping around, screaming, hollering, [and acting] angry." (Id. at 218.) Marie also saw Rahim in Tolisca's apartment and observed "a hole in [Rahim's] neck." (Id. at 217.) Marie stated that when defendant saw her call 9-1-1, he became more upset. He then kicked in Rahim's car windows and threw an object in Ebony's direction. Marie also testified that she saw defendant with a knife in his hand as he kicked in Rahim's car windows.
 {¶ 11} Police recovered from defendant a box cutter with a retractable blade, and a cellular phone. Kevin Jackson, a Columbus police detective with the crime scene search unit, found a knife on the ground approximately one to two feet from Rahim's car. Marie identified that knife as being the same one that she saw defendant holding. James Kuhlwein, a medic with the Columbus Fire Department, testified that Rahim's wound started at the center of her neck and went to her right ear. He further testified that if the blade had gone any deeper and hit either her trachea or jugular, Rahim's injury would have been life threatening.
 {¶ 12} David LaRoche ("Detective LaRoche"), a Columbus police detective, was one of the officers dispatched to the scene. There, Detective LaRoche took a statement from Tolisca, and asked her about the knife found next to Rahim's car. Tolisca identified the knife as her kitchen knife. Detective LaRoche also testified that the DNA, which was taken from the box cutter's blade, belonged to Rahim.
 {¶ 13} Tolisca testified for the defense. She stated that she was still romantically involved with the defendant, and did not want to see defendant get into any trouble. (Id. at 283.) She testified that defendant felt uncomfortable around Rahim, and would leave when Rahim came over to the apartment. Tolisca also testified that sometime in 2002, Rahim left an angry message on Tolisca's voicemail threatening to shoot defendant. Rahim denied making that threat.
 {¶ 14} Tolisca testified that after the group returned from the movies, defendant was on the phone with his mother. She denied that defendant asked her if she had had sex with Rahim, nor did she remember defendant threatening to kill everyone. Defendant asked Rahim and Ebony to step outside so that he could speak with Tolisca. Once alone, defendant told Tolisca that he was leaving.
 {¶ 15} After she and defendant talked, he left the apartment through the front door, and she invited Rahim and Ebony back inside. A few minutes later, defendant returned to the back door and asked Rahim and Ebony to leave. Tolisca testified that Rahim and defendant began to argue. Rahim then ran up to defendant, pointed her finger in defendant's face, and said "Nigger, have you got a problem with me?" (Id.) Rahim pushed defendant, and he pushed her back. Tolisca then got in between them. At that point, she claimed that she saw Ebony go into the kitchen and retrieve a kitchen knife, which Rahim took and put down her pants. Next, Rahim punched defendant in the face. Defendant responded, "I don't have time for this," and walked away. (Id. at 274.) Rahim then grabbed and pulled defendant by his coat and threatened to shoot him. Ebony denied ever handing Rahim a knife, and Rahim denied having had a weapon.
 {¶ 16} Tolisca denied having seen defendant with a box cutter, nor did she see defendant cut Rahim with it. She also testified that she gave a statement to Detective LaRoche, and told him that she saw Ebony hand Rahim a knife.
 {¶ 17} Defendant testified to a different version of the facts. He testified that when the group returned from the movies, he was on the phone talking to his mother. He got off the phone and asked Tolisca, "what is going on with you." (Trial Tr. Vol. II at 323.) He then told Rahim and Ebony that he wanted to speak with Tolisca, so they left and stood outside the back door. Defendant told Tolisca that he was leaving her and had packed his belongings, to which she responded, "I don't care." (Id. at 347.) Defendant denied threatening to kill anyone.
 {¶ 18} After their conversation was over, defendant wanted to clear his mind so he left through the front door and began to walk around the apartment complex. Defendant ran into a neighbor, who was on his way to see defendant to return tools, which he had borrowed earlier that day to fix a car. Defendant had lent the neighbor a box cutter and a screwdriver, but the neighbor returned only the box cutter, which still had its blade extended.
 {¶ 19} Defendant then went to the back door of his apartment and stood outside for a few minutes listening to the group. When he stepped into view, he called to Rahim and Ebony and asked how long they planned on staying. He then asked them to leave. Rahim and Ebony just stood there and looked at defendant, but did not answer. Defendant then asked, "why are you disrespecting me?" (Id. at 326.) Rahim next "jumped into a fit of rage and ran towards the back door." (Id. at 327.) She kicked the back door, which hit defendant, and caused him to move backwards. The two began to exchange words, and Tolisca stepped in between Rahim and defendant, who at that point began to walk away. Rahim ran after defendant, jumped in his face, and said "nigger, I have got something for you. I will blast your ass." (Id. at 327.) She then punched him in the eye. Defendant turned away and took a couple of steps to leave, but Rahim grabbed him by the back of his coat. He thought Rahim was going to shoot him, so he swung his arms out of his coat sleeves to free himself. The box cutter, with its blade extended, was still in his hand. Defendant testified that when he swung his arms out of his coat, he accidentally cut Rahim's neck. Rahim denied punching defendant.
 {¶ 20} After realizing she was cut, Rahim, accompanied by Ebony, ran toward the apartment. Rahim tumbled near her car, and as she did so, defendant saw a knife fall out of her pants. Defendant picked up the knife, which he realized was his kitchen knife, and began to yell at Tolisca. He threw the knife to the ground, yelled at Tolisca, then proceeded to kick in Rahim's car windows.
 {¶ 21} The jury found defendant guilty of felonious assault and acquitted him on the charge of attempted murder. The trial court sentenced defendant to a five-year prison term for the felonious assault conviction.
 {¶ 22} Defendant appeals, assigning the following errors:
[1.] Appellant's conviction was not supported by sufficient evidence and was against the manifest weight of the evidence.
[2.] Appellant's due process rights under the state and federal constitutions were violated when the trial court prevented cross examination of a state's witness regarding provocation by the alleged victim.
 {¶ 23} Defendant contends in his first assignment of error that his conviction was not supported by sufficient evidence and was against the manifest weight of the evidence, because the state failed to prove that defendant acted with the required culpable mental state because defendant's slashing of Rahim's neck was accidental. Defendant further contends that the verdict is against the manifest weight of the evidence because the conflicting testimony regarding whether Ebony gave Rahim a knife, and Marie Ford's testimony that she saw defendant with it, misled the jury into concluding that defendant was the aggressor. "The legal concepts of sufficiency of the evidence and weight of the evidence are both quantitatively and qualitatively different." State v. Villa-Garcia,
Franklin App. No. 03AP-384, 2004-Ohio-1409, at ¶ 18, quoting, State v.Thompkins (1997), 78 Ohio St.3d 380, paragraph two of the syllabus. Therefore, each standard will be separately delineated.
 {¶ 24} The Ohio Supreme Court described the role of an appellate court presented with a sufficiency of the evidence argument in State v. Jenks
(1991), 61 Ohio St.3d 259, paragraph two of the syllabus:
An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. (Jackson v. Virginia (1979), 443 U.S. 307, 99 S.Ct. 2781, followed.)
 {¶ 25} Whether the evidence is legally sufficient is a question of law, not fact. State v. Thompkins (1997), 78 Ohio St.3d 380, 386. In determining the sufficiency of the evidence, an appellate court must give "full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." Jackson v. Virginia
(1979), 443 U.S. 307, 319, 99 S.Ct. 2781. Consequently, the weight of the evidence and the credibility of the witnesses are issues primarily determined by the trier of fact. State v. Yarbrough, 95 Ohio St.3d 227,2002-Ohio-2126, at ¶ 79; State v. Thomas (1982), 70 Ohio St.2d 79, 80. Thus, a jury verdict will not be disturbed unless, after viewing the evidence in a light most favorable to the prosecution, it is apparent that reasonable minds could not reach the conclusion reached by the trier of fact. State v. Treesh (2001), 90 Ohio St.3d 460, 484; State v. Jenks
(1991), 61 Ohio St.3d 259, 273.
 {¶ 26} A manifest weight argument is evaluated under a different standard. "The weight of the evidence concerns the inclination of the greater amount of credible evidence offered in a trial to support one side of the issue rather than the other." State v. Brindley, Franklin App. No. 01AP-926, 2002-Ohio-2425, at ¶ 35, citation omitted. In order for a court of appeals to reverse the judgment of a trial court on the basis that the verdict is against the manifest weight of the evidence, the appellate court must disagree with the fact finder's resolution of the conflicting testimony. Thompkins, supra, at 387. The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses, and determines whether, in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction. Id., quoting State v.Martin (1983), 20 Ohio App.3d 172, 175.
 {¶ 27} A defendant is not entitled to a reversal on manifest weight grounds merely because inconsistent evidence was presented at trial.State v. Raver, Franklin App. No. 02AP-604, 2003-Ohio-958, at ¶ 21. The determination of weight and credibility of the evidence is for the trier of fact. State v. DeHass (1967), 10 Ohio St.2d 230. The rationale is that the trier of fact is in the best position to take into account inconsistencies, along with the witnesses' manner and demeanor, and determine whether the witnesses' testimony is credible. State v.Williams, Franklin App. No. 02AP-35, 2002-Ohio-4503, at ¶ 58; State v.Clarke (Sept. 25, 2001), Franklin App. No. 01AP-194. The trier of fact is free to believe or disbelieve all or any of the testimony. State v.Jackson (Mar. 19, 2002), Franklin App. No. 01AP-973; State v. Sheppard
(Oct. 12, 2001), Hamilton App. No. C-000553. Consequently, although an appellate court must act as a "thirteenth juror" when considering whether the manifest weight of the evidence requires reversal, it must give great deference to the fact finder's determination of the witnesses' credibility. State v. Covington, Franklin App. No. 02AP-245, 2002-Ohio-7037, at ¶ 22; State v. Hairston, Franklin App. No. 01AP-1393, 2002-Ohio-4491, at ¶ 17.
 {¶ 28} In order to convict defendant of felonious assault, the state must prove that the defendant acted knowingly when he caused serious physical harm to Rahim. R.C. 2903.11(A)(1). The definition of "knowingly" is found in R.C. 2901.22(B), which provides that "[a] person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist." Thus, a defendant acts knowingly, when, although not intending the result, he or she is nevertheless aware that the result will probably occur. State v. Edwards (1992),83 Ohio App.3d 357, 361. Therefore, felonious assault under R.C.2903.11(A), combined with the definition of "knowingly" found in R.C.2901.22(B), does not require that a defendant intended to cause "serious physical harm," but rather, that the defendant acted with an awareness that the conduct probably would cause such harm. State v. Lee (Sept. 3, 1998), Franklin App. No. 97APA12-1629.
 {¶ 29} Defendant contends that the evidence presented at trial is insufficient to prove that he knowingly caused or attempted to cause serious physical harm to Rahim. In that regard, defendant admits that he held a box cutter in his hand while he and Rahim argued, but Rahim's injury was "an unfortunate accident and nothing more." (Defendant's Brief at 5.) Defendant further states "[t]he fact [he] kicked out the windows of Rahim's car after Rahim was injured supports the conclusion that Rahim did have a knife, was being dishonest with the jury and showed how upset [he] was when he learned just how much he was in danger." (Id.)
 {¶ 30} We find that the testimony and the evidence, when viewed in a light most favorable to the state, as we are required to do, could convince the average mind of defendant's guilt beyond a reasonable doubt. Although defendant attacks Rahim's credibility, an appellate court does not weigh credibility when considering an insufficiency of the evidence argument. State v. Coit, Franklin App. No. 02AP-475, 2002-Ohio-7356, citing Ruta v. Breckenridge-Remy Co. (1982),69 Ohio St.2d 66, 68-69. Rahim testified that when defendant returned to the apartment and found her and Ebony still there, he began to curse and ordered them to leave. As she exited the apartment's back door, words were exchanged, prompting Tolisca to get in between Rahim and defendant to avoid a physical fight. Defendant, who had an open box cutter in his hand, reached around Tolisca and struck Rahim in the neck. Based on the evidence and the testimony of all the witnesses viewed in a light favorable to the state, a rational trier of fact could have found beyond a reasonable doubt that defendant knowingly caused or attempted to cause serious physical harm to Rahim by slashing her neck with the box cutter. Therefore, we find that there was sufficient evidence to convict defendant on the count of felonious assault.
 {¶ 31} Similarly, we cannot say that the jury's verdict was against the manifest weight of the evidence. The basis for defendant's manifest weight argument is that the jury was misled into concluding that he was the aggressor because of the witness' conflicting testimony. A conviction, however, is "not against the manifest weight of the evidence simply because the jury believed the prosecution testimony." State v.Moore, Montgomery App. No. 20005, 2004-Ohio-3398, quoting State v.Gilliam (Aug. 12, 1998), Lorain App. No. 97CA006757. In this case, the trial court gave the jury the proper instruction regarding its role in evaluating the credibility of the witnesses, and the jury chose to believe the state's witnesses and version of events as it was free to do. (Id., citation omitted) Jackson, supra; Sheppard, supra. Moreover, whether or not defendant was the aggressor is irrelevant because he did not argue self-defense, but rather, that he injured Rahim by accident. Thus, the real issue before the jury was whether defendant "knowingly" caused serious injury to Rahim, which the jury answered in the affirmative. Although defendant disputes how he came to make contact with Rahim, asserting that he accidentally slashed her throat when he swung his arms trying to free himself of his coat, the fact remains that he had an open box cutter in his hand during their argument, and this box cutter slashed Rahim's neck, causing serious physical harm. After reviewing the entire record, weighing the evidence and all reasonable inferences, we find that the jury did not clearly lose its way and create such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.
 {¶ 32} In his second assignment of error, defendant asserts that the trial court erred when it ruled defense counsel could not question Detective LaRoche about statements Tolisca White made to him at the scene because said testimony was hearsay without an exception. Specifically, defense counsel attempted to elicit testimony from Detective LaRoche that Tolisca told him that she saw Ebony hand Rahim a knife. Defendant argues that the trial court's reliance upon the hearsay rule was misplaced because the purpose of the question posed to Officer LaRoche was to impeach Ebony, and was not offered for the truth of the matter. The state argues that Evid.R. 616(C) precludes Detective LaRoche's testimony. It also argues that the error, if any, was harmless because Tolisca testified that she saw Ebony hand Rahim a knife and told the jury that she related that observation to Detective LaRoche. We agree with the state, and find that because the evidence excluded ultimately came before the jury in an unrestricted fashion, the trial court did not err, and even if it did, Tolisca's testimony rendered the error harmless. Nonetheless, we will address the arguments raised by defendant.
 {¶ 33} Trial courts have broad discretion in the admission of evidence. As such, this court will not disturb the decision of the trial court absent an abuse of discretion and a showing that defendant has been materially prejudiced. State v. Maurer (1984), 15 Ohio St.3d 239, 265. "The term `abuse of discretion' connotes more than an error of law or judgment, it implies that the court's attitude is unreasonable, arbitrary or unconscionable." Blakemore v. Blakemore (1983), 5 Ohio St.3d 217, 219. When applying the abuse of discretion standard, an appellate court may not substitute its judgment for that of the trial court. Pons v. OhioState Med. Bd. (1993), 66 Ohio St.3d 619, 621. Moreover, a new trial should not be granted unless the accused was prejudiced or may have been prejudiced by the evidence improperly admitted. R.C. 2945.83.
 {¶ 34} The common law definition of hearsay was codified into Evid.R. 801, which defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Hearsay is not admissible unless an exception applies. See Evid.R. 802. In this case, Tolisca's statement to Detective LaRoche had no impeachment value whatsoever unless the jury first found it to be true. Thus, defense counsel's attempt at eliciting Tolisca's statement through Detective LaRoche's testimony is the quintessential example of hearsay. In State v. Kemmerling, Franklin App. No. 01AP-1304, 2003-Ohio-2694, we held that it was harmless error, if any, when the trial court permitted the investigating officer to repeat statements made to him by the victim at the scene of the crime. Inherent in our decision, however, is that the officer's testimony was, in fact, hearsay. Given the foregoing, we find that the trial court did not err when it precluded Detective LaRoche from repeating a statement made to him by Tolisca on the grounds said testimony was hearsay.
 {¶ 35} At oral argument, defendant alternatively argued that Detective LaRoche's testimony should have been admitted because Tolisca's statements to him were an excited utterance. Defendant, however, did not assert that argument at trial, nor did he raise that issue in his appellate brief. Thus, we are not obligated to consider that argument because it is untimely. Watkins v. Ohio Dept. of Human Services, Franklin App. No. 00AP-224 ("an issue raised during oral argument for the first time and not assigned as error in an appellate brief is untimely."), citing State v. Chambers (July 13, 2000), Franklin App. No. 99AP-1308. Moreover, we cannot say that defendant laid the proper foundation for Tolisca's statement to be admitted under the excited utterance exception to the hearsay rule.
 {¶ 36} Further, we find defendant's impeachment argument without merit. Defendant contends that he should have been allowed to question Detective LaRoche about Tolisca's statements because Evid.R. 607 permits the credibility of a witness to be attacked by any party, and the purpose of his questioning Detective LaRoche was to impeach Ebony Milton. While it is true that Evid.R. 607 allows for the credibility of any witness to be attacked, the power to do so, however, is not unfettered.
 {¶ 37} Methods of impeachment are addressed in Evid.R. 616. Evid.R. 616(C) provides:
Specific contradiction. Facts contradicting a witness's testimony may be shown for the purpose of impeaching the witness's testimony. If offered for the sole purpose of impeaching a witness's testimony, extrinsic evidence of contradiction is inadmissible unless the evidence is one of the following:
(1) Permitted by Evid. R. 608(A), 609, 613, 616(A), 616(B), or 706;
(2) Permitted by the common law of impeachment and not in conflict with the Rules of Evidence.
 {¶ 38} The staff note to the 1998 Amendment of Evid.R. 616(C) states that "contradiction may involve the testimony of one witness that conflicts with the testimony of another witness (called `specific contradiction')." "Impeachment by contradiction is a recognized mode of impeachment not governed by the Rules of Evidence but rather by common law principles." State v. Conley (Mar. 21, 2000), Franklin App. No. 99AP-579, citing United States v. Perez (C.A.1, 1995), 72 F.3d 224, 227. See, also, Boggs v. Brigano (C.A.6, 1996), 82 F.3d 417, quoting Mueller Kirkpatrick, Evidence § 6.58, at 662 ("[a]ppropriate impeachment by contradiction includes presenting `testimony by another witness that (if credited) rebuts or undercuts or limits, or raises doubts about * * * the testimony by an earlier witness * * * even though it amounts to `extrinsic evidence')".
 {¶ 39} A party, however, may not introduce extrinsic evidence of contradiction on merely "collateral matters." State v. Kehn (1977),50 Ohio St.2d 11, 17 ("evidence correctly excluded because it would have created a dispute about extraneous or collateral matters"); Conley,
supra; State v. Pandolfi, Lake App. No. 2001-L-061, 2002-Ohio-7265. "Collateral facts" are defined as "outside the controversy, or are not directly connected with the principal matter or issue on dispute." Black's Law Dictionary (6 Ed. 1990), at 262. Thus, unless the knife had some bearing on whether defendant knowingly slashed Rahim's neck, it is merely collateral.
 {¶ 40} In Pandolfi, supra, the defendant attempted to present the testimony of a witness with whom the defendant was speaking on his cellular phone at the time of his arrest. The trial court refused to allow the witness to repeat statements made by the investigating officer, which the witness claimed to have heard through defendant's cellular phone. On appeal, the defendant argued that the statements should have been admitted to impeach the officer's credibility. The court of appeals stated that the witness' statements were irrelevant and had "no bearing whatsoever" on the ultimate issue in the case. As such, it held that the witness' statements were hearsay without an exception. It also held that if the purpose of the witness' testimony was to impeach the investigating officer, then "this use of extrinsic evidence is not permitted by the rules of evidence" and also barred by the collateral matters rule. Id. at ¶ 40.
 {¶ 41} Applying Pandolfi herein, we reach the same result. Defendant's attempted use of Detective LaRoche's testimony to impeach Ebony with Tolisca's statement that she saw Ebony hand Rahim the kitchen knife is an impermissible use of extrinsic evidence. We also find that such use is prohibited by the collateral matters rule because Tolisca's statement had "no bearing whatsoever" on whether defendant knowingly slashed Rahim's throat, which was the ultimate issue in this case. Nor could it have had any bearing on that issue, given defendant's admission that he saw the knife only after Rahim's throat was already slashed. (Trial Tr. Vol. II at 330, 373). Pandolfi, supra; Kehn, supra. We therefore conclude that the trial court did not abuse its discretion by refusing to admit Officer LaRoche's testimony as to statements made by Tolisca.
 {¶ 42} Lastly, as previously stated, Tolisca testified that she saw Ebony hand Rahim the knife, and also stated that she told the same to Detective LaRoche. Therefore, defendant was able to present that evidence in an unrestricted fashion to the jury, and as such, he cannot prove prejudice because the evidence excluded by the trial court ultimately reached the jury. For that reason, we do not find the trial court erred, and even if the initial exclusion constituted error, Tolisca's testimony rendered the error harmless.
 {¶ 43} Based on the foregoing reasons, defendant's assignments of error are overruled, and the judgment of the Franklin County Common Pleas Court is affirmed.
Judgment affirmed.
Klatt and French, JJ., concur.
[1] Because Rahim is legally a female, we will use feminine pronouns.